**ADAMS et al. v. MACKLIN CO.**

No. 4922.

District Court, E. D. Michigan, S. D.
Dec. 31, 1946.

Jack N. Tucker and Morton Eden, both of Detroit, Mich., for plaintiffs.

Bisbee, McKone, Badgley & McInally and Maxwell Badgley, all of Jackson, Mich., and Beaumont, Smith & Harris and Frank E. Cooper, all of Detroit, Mich., for defendant.

LEDERLE, District Judge.

### Findings of Fact

1. This is an action brought by several hundred employees of the defendant, Macklin Company, a Michigan corporation, claiming damages of $1,500,000, being double the amount of additional compensation allegedly due them under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201—219, for work performed by plaintiffs in defendant's manufacturing plant located at Jackson, Michigan, within this Division of this District. The period of claim covers the whole period of 6 years antedating suit allowable under the Michigan Statute of Limitations, Comp. Laws 1929, § 13976, N.S.A. 27.605, which is the applicable limitation period in the absence of a uniform nation-wide limitation period fixed by Congress for such actions.

2. At the close of plaintiffs' case in chief, proof was complete as to only one plaintiff, namely, Harvey DeWaters. Thereupon, the attorneys for the parties negotiated in an attempt to stipulate that a decision on the claim of plaintiff DeWaters for additional compensation would be binding upon all parties, leaving the calculations of amounts due other employee-plaintiffs for later determination in event plaintiff DeWaters prevailed. Counsel were unable to reach such an agreement, and, at the suggestion of the court, counsel for defendant moved that a separate trial be granted as to plaintiff DeWaters under Federal Rules of Civil Procedure, rule 20 (b), 28 U.S.C.A. following section 723c. Over objection of plaintiffs' counsel, the motion was granted. Thereupon, defendant moved for a judgment in its favor as to plaintiff DeWaters. The case having been tried to the court, in accordance with Rules 41 (b) and 52 (a), as interpreted by Bach v. Friden Calculating Co., 6 Cir., 1945, 148 F.2d 407, in granting such motion, these findings of fact and conclusions of law are being filed.

3. Defendant concedes that plaintiff DeWaters was engaged in an occupation necessary to the production of goods for commerce, within the meaning of the Fair Labor Standards Act. Defendant has always compensated its employees in excess of the statutory hourly minimum established by such Act. The sole controversy here is whether the parties' agreed method of calculating the earnings paid plaintiff by defendant for straight and overtime hours at a fixed hourly rate, including time and a half for overtime, plus a fluctuating monthly bonus applied pro rata to the total amount of each employee's straight and overtime pay at the fixed rate, meets or contravenes the requirement of Section 7 (a) of the Act, 29 U.S.C.A. § 207(a), that an employee shall be compensated for overtime hours at a rate not less than one and one-half times the regular rate at which he is employed.

4. The defendant company manufactures grinding wheels and other abrasive products in its Jackson plant, where for a number of years it has employed approximately 400 employees. Its general method of transacting business is to have a sales representative call upon each prospective customer, make an analysis of the customer's needs,

and solicit an order to fill such specific needs. Upon obtaining an order, the goods contracted for are manufactured to specification. As a result of this method of operation, the inventory carried is ordinarily very small and the need for production workers fluctuates with orders to manufacture specific articles. Defendant operates in a keenly competitive field, and, consequently, its products must be of high quality and, at the same time, priced to meet such competition. To accomplish these objectives, defendant has attempted to secure the cooperation of its employees, so that they will take an active interest in the operations of the plant.

5. The defendant has always operated on a very liberal policy toward its employees. It has long been accustomed to grant Service Awards to employees at Christmas based on years of service, Suggestion Awards for useful employee suggestions for improvements in plant work, vacations with pay, and, since 1941, has operated a Hospitalization and Surgical Benefit Plan for its employees, to which the company contributes $7,000 annually. Also since 1941, with an annual contribution of $12,000 by the company, it has operated for its employees an Annuity Plan, which, in addition to providing annuities to employees, also provides that if an employee resigns before his annuity matures, he is entitled to repayment of his total contribution plus interest. Since 1935 it has operated a Group Insurance Plan for the employees, under which the company pays the entire premium on a $1200 insurance policy for each employee, and, in connection therewith, each employee may take out additional insurance in the amount of $1,000 for a premium of 60 cents a month. This Group Policy also provides that an employee may continue the insurance upon leaving the company, without any physical examination. The company also operated a plan whereby, at each employee's option, the employee's share of the so-called Production Savings Plan, described hereinafter, could be deposited in a bank by the company to the respective employee's account, and the company, through a contract with the bank, contributed to these employee accounts in the bank an additional amount equal to the amount of interest paid the individual employee-depositor by the bank. The company also, since 1930, has operated a benefit fund, known as the "Macklin Benefit Fund". In 1941 the company purchased and started operation of an 8 acre recreation field adjoining the plant, equipped for many sports, picnics, etc., for the employees.

6. For upwards of 10 years, defendant has hired all hourly rated employees, except guards, at fixed hourly rates, which have been increased progressively from time to time. Each increase was made voluntarily by the company, not to meet employees' demands nor as a result of negotiations with employees' representatives. Prior to 1945, the employees were not represented by a union. The union was organized in February, 1945, and was certified in December, 1945. The increases in the general fixed base hourly rates have raised this rate from 65 cents in March, 1937, to 90 cents in June, 1942, since which latter date it has remained constant. The present hiring-in rate is 70 cents an hour, with an increase of 5 cents per hour each month until the general 90 cent rate is reached. Substantially all plaintiffs originally named in this suit are employed at such fixed base rate of 90 cents an hour. Some employees in common labor classifications, and women employees, receive lower fixed base rates, and a few maintenance workers receive 95 cents an hour. Workers on the night shift receive 5 cents per hour night shift differential.

7. Prior to the effective date of the Fair Labor Standards Act, the defendant paid its hourly-rated employees on a straight time basis for overtime work. Since the effective date of the Act, payment for overtime has been at the rate of 150% of the straight time rate.

8. In normal times, defendant's business fluctuates in accordance with the demand for its products. In early 1938, defendant's business had fallen off to such an extent that it was necessary to lay off a large portion of its employees, and those not laid off were employed only part time. In part to compensate the employees for the loss of time and earnings, and also to create better management-employee relations, during the

summer of 1938 defendant's management developed an income sharing plan, which is called the "Production Savings Plan," to supplement the guaranteed fixed hourly rates. It was contemplated that, in this manner, during periods of high production the employees' earnings would exceed the established fixed hourly rates. This plan was not suggested nor developed at the instance of the employees, but solely by the company management. After the plan was formulated, it was discussed with a committee representing the employees, known as the Relations Committee, which approved of the plan. It was then presented and explained to all production employees at open meetings held by the management during paid working hours. The plan was developed, presented, and agreed upon prior to the effective date of the Fair Labor Standards Act, and was put into operation on October 1, 1938, since which time it has operated according to this agreement, except that defendant's management has voluntarily increased the percentage allocated thereunder to employees.

9. In addition to the aforesaid discussion and presentation of the plan, each employee was furnished with a booklet describing the plan and other features of the parties' employment contract. From month to month notices have been posted on the company bulletin board, setting forth the money, if any, which would be distributed to the employees under the plan for the preceding month's business. In recent years, at request of the employees and at considerable expense to the defendant, special memoranda were prepared and given each employee every month, explaining the effect the plan had upon computation of the respective employee's earnings for the preceding month.

10. The plan provides for a total payment to all hourly-rated plant production and maintenance employees, except gate guards, of a sum arrived at by taking a specified percentage of the dollar value of all production which enters the final Inspection Department, with adjustments for partially manufactured products, computed on a monthly basis. If this sum exceeds the amount that was paid to all employees during the month at the fixed base hourly rates, including time and a half for overtime, the difference is distributed pro rata to each employee upon his monthly earnings. In this manner, for each overtime hour worked, each employee is compensated at the rate of 150% of his fixed hourly base rate and 150% of his hourly straight time proportion of the Production Savings Fund. If the sum equals or is less than the amount paid to all employees at the fixed base hourly rates, including time and a half for overtime, it is disregarded. Employees do not commence to participate in the plan until they have completed one full month's employment with the company. Percentages under the plan are calculated to the nearest ½%.

11. There is no claim that the company's records have not been properly kept, nor does plaintiff question either the accuracy of the company's records of hours worked and amounts paid or that payments were allocated to each employee in accordance with the provisions of the plan. It is the theory of the plaintiff that the Production Savings Plan for sharing a portion of the profits with the employees, is illegal, even though these additional payments are allocated so that the employees who work overtime receive time and a half for such overtime. In order to sustain this contention he sought to prove that the regular rate at which he was employed, included this so-called bonus. The evidence in this case establishes that neither the employee nor the employer had any such agreement or understanding. Both parties fully understood that the regular rate of pay was the hourly rate that was fixed at the time of the employment, subject to later adjustments, and that whatever the employee was to receive in addition to that, would be considered as a bonus or incentive pay.

12. There is no evidence in this record that any employee ever complained to any member of the company management prior to the time this suit was instituted. Plaintiff DeWaters testified that, except for the division of the extra funds, the plan was entirely satisfactory to him, and he was of the opinion that it resulted in a greater production of goods of a higher quality. While acting as an inspector and entirely outside his regular line of duty, he advised and assisted other employees in per-

forming their work so that the total output of proper quality production might thereby be increased, for the purpose of producing a larger fund for distribution under this Production Savings Plan.

One other present employee testified that her objection to the method of distributing the Production Savings Fund arose from the fact that, being a woman, she did not get as much overtime work and pay as the men; and, because the employees working overtime receive 150% of the hourly shares of the Production Savings Fund for their overtime hours, the amount that could be distributed on a straight time basis was reduced.

. The only other present employee of the company who appeared as a witness testified that her principal objection to the plan was that she did not understand it.

13. When the plan was first agreed upon the amount allocated to the Production Savings Plan was 19% of the total production for the month that entered the final Inspection Department, with adjustments for partially manufactured products. Although it is not clear how this 19% was adopted, it apparently bore some relation to the direct labor costs of production. This percentage has been voluntarily increased by the company from time to time, and, since April of 1943, it has been 24%. There is no way to determine what part, if any, of this increase is due to the increased efficiency of the production employees. The company has been able to increase the percentage of company income contributable to the production employees partially through the installation of new and improved machinery, improvement in the engineering services, operation of the plant to more nearly capacity, with a steady supply of materials, and to other factors that necessarily go into the operation of a successful manufacturing enterprise. There is no way to determine what portion of the increased earnings that it has been possible to distribute to the employees depends upon any one of these factors. Hours worked by any or all employees and wages paid at fixed base straight and overtime rates are not the only factors which produce or determine

the amount available for distribution to employees under the Production Savings Plan for any month, nor the ultimate amount of any individual employee's distributive share thereof.

14. Since the plan has been in operation, there have been only two months when no fund was available for distribution to employees under the Production Savings Plan. However, during most of this time, there has been a high percentage of demand and production in all machine tool and allied industries due to war conditions.

15. There is no provision in the plan for recovery from the employees of any portion of the funds distributed from the Production Savings Fund in event the amount allocable in any month is less than the amount paid at the fixed hourly rates.

16. In 1945, a representative of the Wage and Hour Division of the Department of Labor made an investigation of defendant's business, and interviewed one of the plaintiffs who appeared as a witness, and at that time this plaintiff made no complaint to this Government representative as to operation of the plan. Defendant has at all times kept the Wage and Hour Division advised of the operations of the plan. There is no evidence that the plan has not met with the complete approval of the Department of Labor. Although there appears to be no case directly in point, the plan is similar to, group incentive plans of other manufacturers in this locality.

17. Congress has not made a determination as to the respective portions of income on production achieved through the mutual contributions of employer and employee that must be allocated to each, except in so far as it has fixed minimum hourly wages, and the employee-plaintiffs herein always earned greatly in excess of the statutory minimum at their guaranteed fixed hourly rates, even without the addition of increased compensation through operation of the Production Savings Plan.

18. Up to the time this action was contemplated, the plan as agreed to and carried out was mutually satisfactory to both the defendant-employer and the plaintiff-employees. Defendant has made a

good faith effort to comply with the Fair Labor Standards Act, and likewise has made a good faith attempt to share with its production employees, not only any increased income resulting from increased efficiency of these production employees, but also a substantial part of the increased income resulting from its investment in improved machinery and from the improvement of its engineering and management. The Production Savings Plan was agreed upon and put into operation prior to the effective date of the Fair Labor Standards Act, not for the purpose of circumventing the Act or maintaining a status quo, but, in a realistic and mathematically workable manner, to add to an existing wage structure of fixed hourly rate with time and a half for overtime, an additional incentive hourly premium rate. The plan is directly in line with the American system of free enterprise, which, on the one hand, requires that the worker be compensated for his best efforts, and, on the other hand, tends to promote co-operation and better relationships among the respective employees and between the employer and employees. Unless it was clearly the intent of Congress to destroy the initiative of forward-looking, progressive employers by rigidly restricting them to one form or pattern, there can be no justification for the courts doing so.

19. The percentage of the total payroll allocable to the Production Savings Fund varied from nothing to over 28%, the average being approximately 16%. If plaintiff's theory as to reallocation of this fund prevails, the average amount added to the compensation for each week of each employee is relatively small. For the six-year period allowable under the applicable Michigan Statute of Limitations, the total amount is substantial.

20. The plaintiff Harvey DeWaters was paid at a rate of not less than one and one-half times his agreed regular rate for each hour of overtime that he worked. The employment contract between plaintiff DeWaters and defendant-employer for computing overtime earnings at one and one-half times both his fixed base hourly rate and a fluctuating group incentive hourly rate is simple, and understandable, and divides the incentive wages into regular and overtime hourly segments in a realistic and mathematically workable manner.

## Conclusions of Law.

1. This is an action brought under the Fair Labor Standards Act of 1938, an Act of Congress regulating commerce. Plaintiff DeWater's employment is subject to the provisions of the Act, the parties are located in this District, and this court has jurisdiction of the action. 28 U.S.C.A. § 41 (8); 29 U.S.C.A. § 201, et seq.

2. Where, as here, it appears that a plaintiff-employee has been paid at a rate of not less than one and one-half times his agreed regular rate for each hour of overtime that he worked, and the employment contract provision for computing overtime earnings at one and one-half times both his fixed base rate and a fluctuating group incentive hourly rate is simple and understandable, and divides the incentive wages into regular and overtime hourly segments in a realistic and mathematically workable manner, the contract conforms to the requirement that the employee be compensated at a rate of not less than one and one half times the regular rate at which he is employed, and plaintiff has failed to establish that he has not been fully compensated in accordance with such Act. 29 U.S.C.A. § 207(a).

3. It follows that defendant's motion for a judgment of no cause of action in its favor and against plaintiff Harvey DeWaters must be granted, and such a judgment is being entered simultaneously herewith.

4. Defendant having waived costs as to plaintiff DeWaters during the course of the trial, no costs will be awarded. Rule 54(d).

5. The following citations relied upon by the parties have been considered as guide posts, but not as completely determinative on the factual situation presented by this record, viz.: United States v. Moore, 95 U.S. 760, 24 L.Ed. 588; Fawcus Machine Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580, 62 S.Ct. 1216, 86 L.Ed. 1682;

268

Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716; Walling v. Helmerich & Payne, 323 U.S. 37, 40, 65 S. Ct. 11, 89 L.Ed. 29; U. S. v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301; Walling v. Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; Walling v. Harnischfeger, 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711; Walling v. Alaska Pacific Consol. Min. Co., 9 Cir., 152 F.2d 812, certiorari denied, 66 S.Ct. 960.

### Judgment.

In accordance with the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered and adjudged that the defendant's motion for judgment in its favor at the close of the case in chief of plaintiff Harvey DeWaters is granted, and that said plaintiff recover nothing from the defendant, Macklin Company, on the cause of action alleged in the complaint herein. It is further ordered and adjudged that no costs shall be awarded to either party.